### IN THE

# Supreme Court of the State of Georgia,

## AT MACON,

# JANUARY TERM, 1863.

PRESENT—JOSEPH H. LUMPKIN,  
    RICHARD F. LYON,   }JUDGES.  
    CHARLES J. JENKINS,

JOHN B. WEEMS, Enrolling Officer, plaintiff in error, *vs.*
JOSEPH H. FARRELL, defendant in error.

1. The regulation of the Secretary of War, of the 29th April, 1862, concerning substitution, in these words, "No person other than those expressly named, or properly implied in the act, shall be exempted, except by furnishing a substitute exempt from military service, in conformity with the regulations already published, (General Orders No. 29), *and such exemption is valid only so long as the substitute is legally exempt*," is within the pale of the authority conferred on him by the 9th section of the Act approved 16th April, 1862; and that delegation of discretion was appropriate to his office, reasonable and proper.

2. The provision of the 9th section of that act, that "persons not liable for duty may be received as substitutes for those who are," is a condition precedent to substitution, but does not prohibit the Secretary of War from providing by "regulation" that the substitution shall be valid only so long as the substitute shall be exempt. On the contrary, the condition precedent is suggestive of such a regulation, and the latter is in strict conformity with its spirit and intention, and has the force and effect of law.

3. The regulation of April 29th is not confined to cases of substitutes under eighteen years of age, when received, and subsequently attaining that age; but is equally applicable to cases wherein the substitutes cease to be exempt by after legislation.

4. As between the person furnishing a substitute and the Government, substitution is more in nature of a gratuitous privilege than of a contract. But, considering it as a contract, *that*, and the contract between the principal and the substitute, are both affected by the regulation of the 29th April, which is part and parcel of each; and neither is impaired by the re-enrollment of the principal, when the substitute ceases to be exempt.

5. The enrolling officer who receives substitutes, and gives discharges to their principals, is but the agent of the Secretary of War. The acts of Congress and authorized regulations of the Secretary constitute his power of attorney, and any discharge he may give, unauthorized by them, is void.

*Habeas Corpus.* Decision by Judge LOCHRANE, at Chambers, 19th December, 1862.

Joseph Farrel applied to the Hon. Osborne A. Lochrane, one of the Judges of the Superior Courts of this State, for the writ of *habeas corpus* to be discharged from the custody of Col. John B. Weems, enrolling officer for the district of Georgia, by whom he was unlawfully detained. The petition states that petitioner, on the 17th of May, 1862, being then subject to enrollment under the Act of Congress, approved 16th April, 1862, and entitled "An Act further to provide for the public defense," availing himself of the provisions of the thirteenth section of said Act, volunteered and enlisted in Company A, of the Irish Jasper Greens, and was then mustered into the service of the Confederate States, and that on the same day he procured and furnished a substitute, one John O. Sullivan, to serve in his stead in said company for three years or during the war, as he was permitted to do by the ninth (9th) section of the above recited Act, and according to the regulations prescribed by the Secretary of War.

The substitute, Sullivan, was thirty-seven years of age, and not then liable to military service, and was accepted in place of petitioner for the war, and petitioner was discharged from the service—when, afterwards, notwithstanding said

discharge, Col. Weems claims and holds petitioner as a conscript liable to do military service.

The writ was granted by Judge Lochrane, and plaintiff in error in response thereto answers that Farrel was enrolled by the proper officer in Chatham county, by virtue of an Act of the Congress of the Confederate States, entitled "An Act to further provide for the public defense," passed 16th April, 1862, and an Act entitled an Act, to amend an Act entitled "An Act to provide further for the public defense," approved 27th September, 1862, and by virtue of General Order, number eighty-two, issued by the Adjutant and Inspector General of the Confederate States, dated Richmond, November 3d, 1862; that Farrel is between eighteen and forty years of age, and is liable to military duty under the acts and order aforesaid, and that respondent is enrolling officer for the State of Georgia, and charged with the execution of said laws and order, and in that capacity he holds petitioner in custody.

The facts as stated in the petition and answer were proved or admitted, and after argument, Judge Lochrane ordered the discharge of Farrel from custody, and respondent excepted, and assigns the same as error.

BLANDFORD and B. HILL, for plaintiff in error.

THOMAS E. LLOYD and WHITTLE, *contra.*

Hon. E. A. NISBET and Mr. MASSEY having similar cases, were by permission also heard in behalf of the defendant in error.

JOHN B. WEEMS, Enrolling Officer, plaintiff in error, *vs.* COOPER WILLIAMS, defendant in error.

*Habeas Corpus.* Decision by Judge LOCHRANE, in Bibb Superior Court, January Term, 1863.

Defendant in error sued out a writ of *habeas corpus* before Judge Lochrane, to be discharged from the custody of plaintiff in error, by whom he alleges he was unlawfully detained,

under the following state of facts, which were admitted to be true:

Defendant was mustered into service as a volunteer in Company F, 45th Regiment Georgia Volunteers, on the 25th of August, 1862, and on the 12th day of September, 1862, he furnished in his stead a substitute named Edward G. Stewart, who was at that time over thirty-five years of age, and was found fit for military duty, and was regularly mustered into the service in lieu of defendant, who was regularly discharged therefrom by the captain of said company and the colonel of the regiment, and is now held in custody by plaintiff in error without authority of law.

Colonel Weems, in his answer, justifies his detention of Williams by virtue of his authority as Commandant of the Camps of Instruction in Georgia, for that the substitute, Stewart, was mustered into service under the ninth section of the Act of Congress, approved 16th April, 1862, entitled " An Act to further provide for the public defense," which is as follows:

" *Be it further enacted,* That persons not liable for duty may be received as substitutes for those who are, under such regulations as may be prescribed by the Secretary of War," and by virtue of a regulation prescribed by the Secretary, dated April 26th, 1862, known as General Order, No. 29, and a supplementary regulation of the 29th of April, 1862, explanatory thereof, and which is as follows: " No person other than those expressly named or properly implied in the above Act, can be exempted except by furnishing a substitute exempt from military service, in conformity with the regulations already published, (General Order, No. 29,) and such exemption is valid only so long as the said substitute is legally exempt." And that by reason of an Act of 22d September, 1862, entitled " An Act to provide further for the public defense," approved April 16th, 1862, said substitute is liable to render military service to the Confederate States in his own person, he being within the ages of thirty-five and forty years.

Upon argument had, Judge Lochrane discharged Williams

from custody, on the ground that having furnished a substitute he was no longer liable to military service, and plaintiff in error excepts.

JOHN R. HILL, for plaintiff in error.

GEO. W. MOORE, *contra.*

*By the Court.*—JENKINS, J., delivering the opinion.

These cases having been returned to the same term of the Court, and depending upon the same rules of law, were consolidated for the purposes of the argument, and the following opinion governs both:

On the 16th of April, 1862, the Congress of the Confederate States passed an Act, entitled "An Act to further provide for the public defense," whereby the President is authorized "to call out and place in the military service of the Confederate States for three years, unless the war shall have been sooner ended, all white men who are residents of the Confederate States, between the ages of eighteen and thirty-five years at the time the call or calls may be made, and who are not legally exempt from military service." By the ninth section of that Act it is provided, "that persons not liable for duty may be received as substitutes for those who are, under such regulations as may be prescribed by the Secretary of War." On the 26th of April, 1862, the Secretary of War made, and through the Adjutant and Inspector General published, a General Order, No. 29, containing regulations, providing for the acceptance of substitutes, and the discharge of persons furnishing them. And again, on the 29th of the same month, he made and published in like manner another (explanatory of the former,) one section of which is in the following words: "No person other than those expressly named or properly implied in the above Act shall be exempted, except by furnishing a substitute exempt from military service, in conformity with the regulations already published, (General Order, No. 29,) *and such exemption is valid only so long as the substitute is legally exempt.*"

Subsequently to the passage of said Act, and the making and publication of said regulations, one of the applicants for discharge having volunteered, and the other having been enrolled for service, offered each a substitute, (to-wit, Farrell on the 17th May, and Williams on the 12th September, 1862,) which substitutes were accepted, and the persons furnishing them severally discharged.   On the 27th September, 1862, the Congress passed an Act amendatory of that of the 16th April, authorizing the President to call out and place in the military service of the Confederate States persons between the ages of thirty-five and forty-five years, and otherwise answering the description given in the previous Act. The substitutes furnished by Farrell and Williams were between the ages of thirty-five and forty-five years when accepted as such, and still are so.   They, therefore, were not liable (in their own persons) for service under the first Act, but are so under the second.

After the passage of the Act of 27th September, Farrell and Williams were again enrolled for service, and denying their liability, each sought a discharge by *habeas corpus* from the custody of the Commandant of Conscripts.   Whether or not, under the circumstances stated, they are liable to this second enrollment is the question we are to consider.

They claim exemption solely in virtue of the discharges granted them severally upon the acceptance of their substitutes.

In their behalf, it is insisted that the substitution authorized by the ninth section of the Act of 16th April, is co-extensive with the term of their enrollment, viz: "for three years unless the war shall have been sooner ended," and that their discharge covers the same time.   They deny the validity of the regulation made by the Secretary of War in his order of 29th April, for that, it is not such a regulation as the Congress authorized him to make—that it is an act of legislation of which the Congress alone is capable.   They further insist, that even if that regulation be binding upon them, a proper construction of it will save their exemption.

1. The first question to be considered is, whether the reg-

Weems *vs.* Farrell and Williams.

ulation of the 29th April is within the pale of the authority conferred on the Secretary of War by the Act of 16th April. How is this discretion to be ascertained; its limit to be defined? By considering all the circumstances of the case—the position of those allowed to put in substitutes—the powers of Congress, and the relation in which the Secretary of War stands to the Congress, and thus seeking to evolve the intention of that body. The first section of the act imposes upon all persons therein described a legal duty—one of perfect obligation. The ninth section provides a conditional exemption from that duty. It follows, therefore, that the exemption is *ex gratia,* and not *ex debito justitia.* The party owing the duty, and having no *claim* to exemption, must take the latter, if at all, upon such terms as the Government, rightfully exacting the former, may choose to impose.

It will be observed that the entire legislation of the Congress, on this subject, is embraced in one short sentence: "Persons not liable for duty may be received as substitutes for those who are, under such regulations as may be prescribed by the Secretary of War." It was certainly in the power of Congress to perfect the entire scheme of substitution, arranging all the details, and leaving no discretion to the Secretary. But they have chosen to do otherwise. The intention to confer upon that officer a large discretion is very apparent. There is but a single limitation affixed, viz: that substitutes shall be persons "not liable for duty"; and this is obviously not for the benefit of those desiring to put in substitutes, but for the public good. It may fairly be questioned, whether the discretion vested in the Secretary does not extend to the rejection by him of the entire policy. The language is permissive; substitutes "*may* be received"—"under such regulations as *may* be prescribed," etc. MAY is generally regarded as a word of permission. In the construction of statutes, *may* is held to mean *shall* in two cases, viz: where the thing to be done "is for the sake of justice, or for the public benefit." Dwarris on Statutes, 712. But the privilege of military substitution is for neither of those purposes. Had the Secretary failed to prescribe regulations, there could

have been no substitution; yet there is no law directing that they *shall* be prescribed.

Waiving this view, however, it will scarcely be affirmed that the delegation to that officer of a large discretion in framing regulations to guard the service of the country against detriment from the abuse of the privilege, would be void. On the contrary, it would seem to be eminently fit and proper. The position of that officer gives him at all times a clearer view of the military necessities of the Government than the members of the Legislature can be supposed to have. He is always at his post, overlooking the entire field of operations, and discerning the changes made in those necessities, by constantly varying circumstances, whilst they are often in recess, pursuing their private avocations. If substitution be a gratuitous privilege, as we think we have shown, it results as a corollary from that proposition, that Congress, in granting it, may either impose terms, or empower an executive officer of the Government to impose them. If the terms be unacceptable to any party enrolled, he may decline the privilege and perform the duty. If he accept it, he must do so, *cum onere.*

2. But it is argued, that so far as the freedom of the substitute from liability for duty is a qualification, Congress has legislated, confining the qualification to the *time* of his reception, and that the Secretary cannot interfere with their action. As already intimated, we regard that as a legislative limitation of the discretion given to that officer, curtailing the privilege. It is a condition precedent, prescribed by Congress; but it does not limit the Secretary's discretion in defining by his "*regulations*" contingencies, upon the happening of which the substitution shall cease, and the liability of the principal revive. Indeed, the condition precedent, contained in the ninth section, is suggestive of the regulation now sought to be evaded. The latter only extends throughout the substitution the spirit and intention of the former. Why was it required that the substitute be not liable for duty? Clearly to avoid the consequence of one man representing two, upon whom the Government had equal claims. But it is no less important to the public service to avoid this consequence, at

Weems *vs.* Farrell and Williams.

any subsequent time, than at the inception of the substitution. Can it be supposed that Congress, in the circumstances surrounding them, did not consider the probable future necessity of calling into the service men aged more than thirty-five years? Could they have intended that a youth aged seventeen years and eleven months should be eligible as a substitute, for three years for a man of twenty-five? In the cases now before us, under further legislation, one of the substitutes became personally liable five months, and the other sixteen days, after the respective acts of substitution. We do not ask whether the continued exemption of their principals, for three years, or during the war, is consistent with the public interest, for we are not legislators. But, as expounders of the law, we do ask, whether it consists with the intent and meaning of Congress as expressed in the ninth section of the act of April 16? Our opinion is that the second section of the Secretary's order of April 29, is a better, more faithful exposition of that intention, and in this we are sustained by the subsequent course of the Congress.

By General Order, No. 58, the Secretary of War required persons enrolled, and certified by competent authority to be unfit for bearing arms, to report to a camp of instruction, that they might be detailed to lighter duty, to which they were competent; but on the 11th October, Congress passed an Act annulling this order, and providing that such persons be not required to assemble at a camp of instruction. Why? Because the order did not accord with legislative intention. They have, however, neither annulled nor modified the regulation of 29th April, and the legitimate inference is, that it does accord with their intention.

For these reasons we regard that regulation as a fixed legal condition of the privilege of substitution.

3. It is next insisted, that even in this view the regulation is inapplicable to these cases. The argument is, that it applies only to cases in which the substitute when received was under eighteen years of age, and subsequently attained that age, or was then exempt by his office or employment, and afterwards left that office or employment, we can see no plau-

sible reason for this restriction. The language used is not more applicable to a case in which the substitute ceases to be exempt under existing laws, by the efflux of time, or change of occupation, than to one in which he ceases to be exempt by further legislation. The only question for our consideration is, whether at the time of the second enrollment of the principal, the substitute had ceased to be exempt in his own person. In the cases before us none will question, that had the substitutes remained at home, enjoying their legal exemptions, these would have been terminated by the Act of September 27th, and as that Act contains no saving of persons then in the army by substitution, there is nothing to prevent the personal liability from attaching. Previously, each had occupied in the army the place of his principal, but, by the passage of that Act, a place was made for himself; and unless it can be implied that Congress contemplated the anomaly of one soldier performing the duty of two, the place of his principal became vacant, and the substitution was no longer valid.

4. The discharge of the parties in custody has been urgently demanded on the ground that the acceptance of the substitute, and discharge of his principal, was a contract between the latter, and the Government, and incapable of cancellation at the will of Congress; and further, that if this be not a contract, the transaction between the principal and the substitute certainly was so, and was induced by the legislation of Congress, whose good faith is pledged not to impair it.

As before remarked, we are inclined to consider the substitution more in the nature of a gratuitous privilege than of a binding contract.

But conceding (for the argument) that it is a contract binding on the Government, and further, that good faith inhibits the cancellation or impairment of the other contract between the principal and substitute, the question presents itself, what were those contracts? They were for such substitution and such only as the Act of April 16th, and the regulations of the Secretary of War in pursuance thereof,

Weems *vs.* Farrell and Williams.

allow. All the terms, conditions and stipulations found to exist in the Act, and in the regulations entered into and became parts of those contracts. One of the regulations existing at the time of each substitution, was that the exemption accruing from it to the principal should be "valid only so long as the substitute should be legally exempt." All parties are presumed to know the law and the regulations referred to in it, and necessary to its practical operation, and from this presumption nothing can relieve them. Thus it appears that the contract of substitution has not been cancelled or annulled by subsequent legislation, but has expired by its own limitation.

It will be observed that we do not rest this opinion upon General Orders No. 82, made and published after the Acts of substitution we are considering, but upon the order of April 29th, which was anterior to them. Number eighty-two appears to be a digest of the several Acts of Congress relating to enrollment, exemption and substitution, and of the orders and regulations of the Department of War, for carrying them into effect. Some of the pre-existing orders and regulations are annulled and others modified by it. The order of the 29th April, is in substance repeated in number eighty-two, but it has been operative from the earlier date.

5. Lastly, it is argued that the discharges granted to the principals, upon the reception of their substitutes, in terms cover the entire period for which the principal was first enrolled, and which has not yet expired. Those discharges are not before us, but if they were, and were found to be for the war, or for all time, they would avail nothing.

The officers giving them were but agents of the War Department. The laws of Congress and the regulations of the Department, constitute their powers of attorney, and any act of theirs, transcending the powers thus given, and especially any act, violating the expressly declared intention of the superior, is simply void. For these reasons we think there was error in the judgments of the Court below, ordering the applicants discharged.

Let the judgment be reversed.

LYON, J., dissenting.

With a full sense of the importance and delicacy of the question involved in this case, and the necessity of unanimity by the Court in its judgment, I have labored earnestly to bring my mind to the same conclusion with my associates, but with all my anxiety I have been unable to do so, and shall briefly assign the reasons for my dissent.

The applicant for discharge under the writ of *habeas corpus*, had been arrested, and was held in custody by the enrolling officer as being subject to the duty prescribed by an Act of Congress, entitled "An Act to further provide for the public defense," approved 16th April, 1862. He claimed his right to a discharge on the ground that he had furnished a substitute, as he was allowed to do by that Act, and had received from the captain of the company, who had received his substitute, an absolute discharge from all further liability to military duty for three years, or during the war, the term of service prescribed by that Act. To this it was replied, on the part of the enrolling officer, that while it was true that such substitute had been furnished and received, the substitute was only thirty-seven years of age, and had himself become liable to a similar duty by the Act of Congress of 27th September, 1862, extending the provisions of the Act of April, 1862, to persons between the ages of thirty-five and forty years, and that by the latter clause of one of the regulations—No. IV, of General Order 29—prescribed by the Secretary of War, in pursuance of the authority vested in him by the same Act allowing substitutes, and with a view to meet such, and similar cases to this, and which said regulation was in force at the time the substitute was furnished, and that as the substitute was no longer legally exempt, the applicant's discharge was no longer valid, but that he was now, by the terms of the Act and the regulation, bound himself to fill his own unexpired term of service. The clause in the regulations of the Secretary of War relied upon to support this position is in the following words: "Such exemption is valid only so long as the said substitute is

legally exempt." It is upon these facts, the application of the regulation to them, and the interpretation of the regulation itself, in reference to the Act of Congress under which it was adopted, its extent, etc., that the question of the case is made—whether the applicant is entitled to a discharge or not? The Court decides that he is not. I maintain on the contrary that he is.

1. Because the Act not only did not clothe the Secretary of War with the power to impose such conditions or terms upon the act of substitution to the extent that is claimed for the regulation I have quoted above, but that if that regulation was intended, and does in fact extend so far, it is *repugnant* to the sense and spirit of the Act, and therefore void.

2. Because that clause of the regulation does not in fact extend, apply to, or control the question in this case.

The Act of Congress, of 16th April, 1862, authorizes the President to call out and place in the military service of the Confederate States, for three years, unless the war shall have sooner ended, all white men, *residents* of the Confederate States, between the ages of eighteen and thirty-five years at the time the call or calls may be made, who are not *legally exempted* from military service; and the ninth section of the Act provides, "that persons not liable for duty may be received as substitutes for those who are, *under such regulations as may be prescribed by the Secretary of War.*"

The Act applies only to the citizens of the Confederate States, the duty created is a military service of three years, and the persons subjected to that duty are all white, male citizens between the ages of eighteen and thirty-five years, who are not exempt by law. The object of the Act was to raise an army adequate to the exigencies and perils of the country, then in its greatest straits, and this, it was thought, would bring into the field all the available and effective arms-bearing population of the Confederacy that could be spared from the agricultural, producing and manufacturing interests, that were as essential to a successful prosecution of the defense—the maintenance of the army in the field, and continued prosperity of the country, as the operations of the

Weems *vs.* Farrell and Williams.

army.   The law, although absolutely necessary, was extreme-ly onerous, and in many cases would have operated oppres-sively, for between the ages of eighteen and thirty-five years there were many subject who could not leave their homes, families and pursuits without sacrifices that no government, however great its necessities, could justly require them to make, if it could possibly be avoided.   To remedy such and other hardships, Congress accorded, as a part of the Act, the privilege to the subject who chose, and was able to do so, of furnishing a substitute.   This privilege going along with the liability to soften its rigor, was a right in the citizen, as abso-lute and indubitable as the liability was imperious and neces-sary.

It is urged that the right to furnish substitutes was not perfect, but that it was circumscribed by the provision that they, the substitutes, might be received " under such regula-tions as may be prescribed by the Secretary of War," and that it the War Department had prescribed no regulations on the subject, no substitute could have been furnished and received, and that therefore the right or privilege of furnish-ing substitutes was coupled with and dependent upon what-ever conditions and terms the Secretary of War might choose to impose.   If this view be a correct one, then the law did not confer any right or privilege upon the citizen to furnish a substitute, but simply clothed the War Department with the power to allow or not, as it thought proper, and if so, then to hamper the privilege with such conditions or terms as to greatly impair, or altogether defeat, its benefits.   I cannot force my mind to assent to such a construction, but it seems to me to be utterly at variance with the letter and spirit of the whole Act.   Could Congress have delegated to the Sec-retary of War such extraordinary power?

I do not believe that it could.   The enactment of laws, being the highest and greatest act of sovereignty, can only be done by the sovereign power of the State.   A law must re-main and continue in force, just as it leaves the Legislature. It stands as it issued from the hands of its creator.   If it be imperfect, incomplete, or defective, by failing to provide

for all contingencies, or in any other respect, such defect cannot be cured, altered, or amended by any subordinate creature. It requires the same power to amend, alter, abridge, or extend it in the slightest respect, that it did, in the first place, to create it; for all or any of these is legislation, and this cannot be delegated. Now, in the case before us, the subsequent extension of the provisions of this Act to persons beyond the age of thirty-five years, and to provide against the possibility of those persons to whom the Act might subsequently be extended, becoming substitutes for those who were then liable, were questions for Congress; that is, whether the Act should be extended, and, if so, whether the substitutes furnished to whom the Act might be extended, should fall within the operation of such future legislation, so as to keep the substitute in the service on his own account, and to require the principal to fill his own place, or employ a new substitute, were questions that Congress could alone consider and control; for it *anticipates* legislation and provides for it, against the right of the citizens. This, I hold, an agent appointed for a specific purpose, that is, to execute the will of Congress as already expressed, cannot do. To hold otherwise is to declare that the Secretary of War, appointed by Congress to execute its declared will, can determine what Congress, under the particular circumstances, ought to have done, or what Congress *will* do, and discharge the duties of his office accordingly, and that the rights given and the duties prescribed must not be measured and ascertained by the law, but by what the agent does and says—thus giving to his acts and declarations the force and effect of law. This, I think, is going too far. A Legislature may devise a scheme, or enact laws, and give therein a general discretion to an agent as to the prosecution of the scheme, the management of details, etc., but in all such cases, the action of such agent must conform, to the letter, to the expressed will of the Legislature. He cannot devise a new scheme—anticipate what the Legislature would do in a case not expressly provided for, nor take anything for granted, but must have a clear and unmistakeable warrant for all that he does. Concede, however, that Con-

gress could have delegated this power: did it do so? I am clear that it did not. The power is alone claimed under the last clause of the 9th section of the Act, already quoted, to-wit: that the substitutes may be received, "under such regulations as may be prescribed by the Secretary of War." Suppose these words had not been added to that clause, but had been omitted by Congress, would it not have been the duty of the Secretary of War, as the head of the War Department, to have prescribed regulations for the service in respect to this subject by which it could be carried into effect, and uniformly throughout the whole service? Would it not have been his duty to prescribe regulations for the examination of the proffered substitute—to declare what should be his physical qualification, etc., so that the intention of Congress, the good of the service, and the rights of the citizen and subject should be promoted and protected? Most assuredly. The words used defining the duties of the Secretary of War would have been implied if they had not been expressly employed. They are but mere general directions to that officer to adopt such regulation as would effect the purpose of Congress, previously declared. The whole section is the same in effect as if Congress had said: the persons upon whom this liability is imposed may be relieved therefrom by furnishing a substitute from those persons who are not liable to this law. And the Secretary of War is directed to carry out this provision by adopting such regulations as will secure the right to the subject, and at the same time protect the service from injury in receiving persons as substitutes who are incapable of performing the duties of soldiers. No new or additional powers were given to the Secretary of War, to defeat or impair the right of substitution, or thwart the declared will of Congress, but the power given was to execute that will, and this was his duty in the absence of such expression. Suppose the War Department *had* prescribed no regulations, would his failure to do so have defeated the right to furnish a substitute? If so, it is the first instance in my knowledge of legislation when the failure of an officer to discharge his duty has legitimately defeated the right of the citizen. The

Courts, in such cases, upon application, have never failed to find a remedy that secured the right.  But it is a simple absurdity to suppose that this officer or any other in like position would fail to discharge such a plain and imperative duty.

As already stated, the liability or duty, created by this Act, was a military service of three years, and the persons subjected to this liability were all the white male residents, that is, citizens or persons, who had placed themselves by their Act in that status towards the Confederate States, who were not otherwise exempt by law, between the ages of eighteen and thirty-five years at the time the call or calls should be made by the President.  This was the duty and these the persons to perform that duty.  All other white male residents, that is, citizens in the sense above stated, were the persons *not* liable to the duty prescribed by the Act.  And from these, says Congress, substitutes may be received for those who are— that is, that the persons who are not liable to the provisions of that Act may be received as substitutes for those persons who are liable to its enactments.  The word substitute has but one meaning, and that is, "one person or thing which is put in the place of another person or thing to answer the same purpose;" and it was in this sense that it was used in this Act.  Congress, then expressly declares that any person subject to the stringent provisions of this law, in order to be relieved from its operation, shall have the right to furnish in *his place* and to perform the same service, not apart but the *whole* service, that he by the law is required to perform, any other person capable of performing that service, that he can procure for that purpose from among those residents or citizens of the Confederate States who are not subject to the duty imposed by this Act.  Now if the regulation imposed by the Secretary of War goes to the extent claimed for it—that is to exclude wholly or partially those persons, from that class from which Congress declares substitutes may be received, who may from the necessities of the country be called upon to perform military service by future legislation, then the regulation does that not only which Congress did not think necessary to enact, but it conflicts directly with the Act of

Congress by circumscribing and narrowing the right or privilege conferred on the subject in lessening the number of persons from whom the substitutes were to be procured. In other words, Congress says to the subject, here are certain persons, any of whom, able to perform your duty, you may employ on the best terms you can as a substitute and he shall be received in your place, and on this you shall be discharged from this duty. The War Department adds, yes, you can do so if you please, but if you do, on the happening of certain contingencies, the substitution shall be no longer valid. Thus diminishing the number of persons from whom substitutes might be received, increasing the difficulty of procuring them, and in a great measure defeating the intended benefit. To sum up the argument, Congress gave the right to the subject of the law to furnish substitutes, and specified the class of persons from whom the substitutes should be taken, and when it directed that the process should be performed under regulations to be prescribed by the Secretary of War, it was intended only that the Secretary of War should prescribe such regulations as would most effectually carry out its will and intention thus expressed, but not to impair or defeat the right given either in whole or in part, and if the regulation has this effect it is void, for the will of Congress must prevail and not that of its agent.

The other position that I take, that the regulation of the Secretary of War relied upon, does not control this case or meet the question made by the record, presents less difficulty than the one I have already discussed. That clause says, that "such exemption," that is the exemption from the duties prescribed by that Act, obtained by one furnishing a substitute, "is valid," shall continue, "only so long as the said substitute is legally exempt." Legally exempt from what? Why, clearly from the liability imposed by the Act of Congress to which the regulation had reference, and which called upon him to prescribe the regulation—the one then in force—not liabilities to be imposed by future legislation, and not then created, and such as might never exist. All acts or regulations must be construed with reference to laws in force—

to the state of things in existence at the time of their enact-
ment or adoption. To anticipate the future wants of the
country and to provide against and for them, is the duty of
Congress, not that of the Secretary of War. That Congress
had done by the passage of the law then in force, which if
not adequate was at least deemed to be so by Congress. This
construction makes the regulation conform strictly to what
the Act of Congress required, and no more, and at the same
time secures to the citizens the full enjoyment of the right
guaranteed by the Act. That is, the regulation so under-
stood is in accordance with the letter and spirit of the Act.
It may be asked if this be the true interpretation of the regu-
lation, what was its object? To this, I answer that it was
intended and does apply to those substitutes who might be
furnished and who at the time of being received were not
subject thereto, but might subsequently fall within the opera-
tion of the Act. Thus, the Act says that all white male
residents between the ages of eighteen and thirty-five years
are liable to the service "except those who are exempt by
law."

General Order, No. 29, of the War Department, of which
the clause under discussion is a part, specifies the persons to
whom the Act referred as being exempt by law, and they are
Justices of the Peace, Sheriffs, Clerks, Postmasters and their
deputies, allowed by law, Masters and Commissioners of Or-
dinary, District and State Attorneys, etc. Now, there was
nothing in the Act or regulation to prohibit any of the per-
sons, holding these various offices, from becoming substitutes
for those who were liable; so long as they retained their offi-
cial positions they were exempt and could not be enrolled,
but when they ceased to hold the offices that protected them,
they fell within the operation of the law, and were no longer
legally exempt but were liable to enrollment. Hence it was
proper and necessary that the Secretary of War should by
regulation provide for such contingency, and to hold, in all
cases when the substitute was furnished from this class of
persons so exempt, the principal to be exempt only so long
as the substitute himself be exempt from the liability of that

Act.   Another class of cases to which the regulation justly applies and which is equally palpable and obvious, is that of young men below the age of eighteen years who might be received as substitutes.   So long as they are below the age of eighteen, they are not liable, but if they be taken as substitutes, and during the term of service arrive at that age, they are then fully within the provisions of the Act, no longer legally exempt, and liable to enrollment. . These are the cases that the regulation controls, and not those substitutes who have been furnished and received, that never become subject to the liability of the Act that *called out* the regulation, and who but for the fact of having become substitutes would have been liable to enrollment under the subsequent Act of 27th September, extending the liability imposed by the Act of April, 1862, to persons between the ages of thirty-five and forty years.

But it is argued, and this argument was pressed upon the Court with great earnestness and ability, that the practical effect of the rule, I insist to be the proper one, is to deprive the country of the benefit of an effective soldier in every instance when such a substitute has been received, and gives it nothing in exchange for such loss ; that the success of our arms may and will be materially affected by thus keeping out of the service such a large class of the very best material of the land, and that therefore it is not to be supposed that either Congress in passing the law, or the Secretary of War in prescribing regulations, could have intended to frame and allow a system that would in its results prove so disastrous. If it be conceded that the rule would prove mischievous, or has done so, it is neither certain or reliable to argue, therefrom, that it was not intended, because Congress and the Secretary of War might, and probably did, fail to foresee or apprehend such a result.   In the history of human legislation it is extremely rare to find the identical results produced that were intended, and nothing more.   Sometimes it fails to accomplish anything, sometimes the opposite, and again the greatest mischief, when nothing but good was intended.   It is impossible for any Legislature to foresee the whole practi-

Weems *vs.* Farrell and Williams.

cal operation and effects of any scheme or system it puts in motion, and by restrictions and provisions provide for every thing, so that it shall go out from their hands perfect and complete in all its details, working exactly to the purposes intended, and to none other, like a well executed piece of machinery in the hands of skilful artizans; but like human nature itself, the scheme, while the main great purpose will perhaps be accomplished, as has been done in this case, may in some point or other be defective, which will take time and experience to remedy. We can not judge of such defects as things that the Legislature must have foreseen and intended or not, as we wish to construe, but we must judge the Act as we find it. If, however, I have stated correctly, in the preceding part of these remarks, the object of the law and the intention of Congress in its passage, no such difficulty could have been foreseen or anticipated, nor if foreseen, would the plan have been changed. Indeed, such objection could not have occurred, for the policy of the Act was to get all the young and effective arms-bearing population, leaving the balance of the men of the Confederacy to raise and furnish provision and material for those in the field and at home, so that if one was taken out of the army by furnishing a substitute, he filled the place of the substitute at home, and perhaps to a better purpose, in raising supplies, etc. What the Government lost one way it thus gained in another. I have given this position more attention than it deserved, because it was about the only view presented in opposition to my construction of the Act and the regulation. There is absolutely nothing in the position for a defect or supposed defect that can not be cured or avoided by the supposition that the Legislature could not have been guilty of so much folly, or have made such an oversight. The argument is but an attempt to warp the Act from its plain intent and meaning, as gathered from the words employed, and its whole bearing upon the plea of the necessities of the country—a plea so often pressed, but never yet legitimately obtaining a *status* in the Courts. It is an argument in fact rather against the *policy* of substitution contained in the Act, to support which the

Weems *vs.* Farrell and Williams.

regulation of a subordinate, which *must* be in conformity to it, is invoked and perverted.

None of the remarks I have made are intended to reflect on the law or the Congress which passed it; on the contrary, I am convinced, after the most careful consideration of it and the various points made upon it, that the law was conceived and executed with wisdom and sagacity, that it contains no defect in the particular under discussion, and less than most Acts, especially for one having such an extensive operation, of such vast importance, and one that has accomplished so much practical good.

It is indeed to be regretted that this question was ever made or insisted upon by the War Department, for all those who, construing the law and the regulation as I do, furnished substitutes like the present applicant, out of that class of persons to whom the Act was extended, can but feel that they have been cruelly oppressed by the Government in breaking up and defeating a contract made by them upon its most deliberate consent. They must feel that the Government in this has violated its plighted faith—a thing much more injurious than the loss of a few soldiers from the army.

To conclude this opinion, already too long, the decision of this question must depend upon the *construction* which the Court may give to the regulation of the Secretary of War, taken in connection with the Act of April, 1862. The construction I give is consistent with the regulation, with the Act, with the rights, interests and good faith of the Government, and the rights of the citizen, while the construction of the Court is virtually inconsistent with all.